# Plaintiff's Exhibit A: Employee Conduct Unit Report



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

# Employee Conduct Unit

**SCOPE OF INVESTIGATION**

On 10/28/2021 at 8:07 PM, a use of force occurred on Offender Dwight Abernathie #1076917 in Housing Unit (HU) 7 at the Eastern Reception Diagnostic and Correctional Center (ERDCC). Offender Abernathie suffered visible injuries. The force employed by custody staff members, (Sergeant (Sgt.) Tyson Manche, Sgt. Carl Hart, Corrections Officer (CO) Dennis Spradling and CO Edwin Messersmith) appeared to the use of force review committee to be excessive constituting offender abuse.

The initial use of force committee consisting of Major Samuel McFerron and Assistant Warden (AW) Jerry Bingham convened on 10/29/2021. The initial review committee stated the use of force was unnecessary and referred the incident for further review.

On 11/03/2021, a final review committee convened, which consisted of Major Samuel McFerron, Deputy Warden Heather Cofer, Warden David Vandergriff, and myself. The committee forwarded the use of force for further investigation due to the possibility excessive force was utilized.

Lead Administrative Support Assistant Kristan Portell submitted a request for investigation (RFI) on behalf of ERDCC Warden David Vandergriff to the Office of Professional Standards (OPS). It was received by the Employee Conduct Unit (ECU) on 11/02/2021. The case was assigned to me by ECU Supervisor Investigator III Richard Adair on 11/02/2021. The video surveillance footage of the incident, photographs and the use of force packet **(TAB A)** were provided to me by Warden Vandergriff.

Based on the information provided in the RFI, the following issues were identified.

**Allegation #1:** Sgt. Carl Hart utilized excessive force by repeatedly striking Offender Abernathie with a closed fist fracturing his (Hart's) right hand and causing injuries to Abernathie's head and facial area.

**Allegation #2:** Sgt. Tyson Manche repeatedly struck Offender Abernathie with a closed fist while Abernathie appeared to be compliant.

**Allegation #3:** CO Dennis Spradling repeatedly struck Offender Abernathie with a closed fist in the torso.

**Allegation #4:** CO Edwin Messersmith failed to report offender abuse.

During the investigation additional allegations and issues were discovered.

**Allegation #5:** CO Gary Tifenauer failed to report a use of force.

*Improving Lives for Safer Communities*    Abernathie v Hart et al 000485



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

**Additional Supervisory Issues:** During the investigation, it was determined that Sgt. Carl Hart, Sgt. Tyson Manche and CO Dennis Spradling violated department policy by using the state computer and email system to send and receive non-work-related information. This issue was not directly related to the scope of this investigation. The policy violations are identified in the Summary of Investigative Findings section of this report as a supervisory issue.

## BACKGROUND

**Sgt. Tyson Manche E0123599** began his employment with the Missouri Department of Corrections (MODOC), Division of Adult Institutions (DAI) on 03/26/2012, at ERDCC as a CO. Manche promoted to his current position of sergeant on 03/12/2018. Manche is supervised by Lieutenant (Lt.) Richard Pilny.

**Sgt. Carl Hart E0124214** began his employment with the MODOC, DAI on 06/18/2012 as a CO, at ERDCC. Hart promoted to his current position of sergeant on 05/10/2020. Hart is supervised by Lt. Richard Pilny.

**CO Dennis Spradling E0142749** began his employment with the MODOC, DAI on 12/17/2018 as a CO, at ERDCC. Spradling is supervised by Sgt. Nathan Tedder.

**CO Edwin Messersmith E0147932** began his employment with the MODOC, DAI on 08/17/2020 as a CO, at the Farmington Correctional Center (FCC). Messersmith transferred to ERDCC on 09/12/2021 and he is supervised by Sgt. Joshua Lee.

**Sgt. Robert Reckert E0133532** began his employment with the MODOC, DAI on 11/30/2015 as a CO, at ERDCC. Reckert promoted to his current position of sergeant on 01/17/2021 and he is supervised by Lt. Gary Fenwick.

**CO Donald Armbruster E0124770** began his employment with the MODOC, DAI on 09/10/2012 as a CO, at ERDCC. He is supervised by Sgt. John Farrell.

**CO Gary Tiefenauer E0146299** began his employment with the MODOC, DAI on 012/23/2019as a CO, at ERDCC. He is supervised by Sgt. Joshua Lee.

**Offender Dwight Abernathie #1076917** is incarcerated in the MODOC for two counts of first-degree assault and escape or attempted escape from custody while under arrest for a felony. He began serving his twenty-four year sentence on 04/29/2021 and he has a maximum release date of 04/26/2045.

## INVESTIGATION DETAILS

ERDCC video footage of the incident was obtained from Warden Vandergriff. The DVD of the video recording titled "ERDCC Video Footage 2021110034" contains video footage of HU 7 on 10/28/2021 from 8:05 PM through 8:30 PM. I reviewed the video footage which showed Sgt.

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000486



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

Hart and COs Messersmith and Spradling pepper spray and pursue Abernathie to the shower. With the assistance of responding staff they subdued Abernathie. The pertinent video footage is detailed in a supplemental report. The video footage is maintained in the case file. The video footage in its entirety is available if needed for review upon request.

Offender Abernathie's telephone calls (Securus) and emails (JPay) were examined from 10/28/2021 through 03/11/2022 for any mention of the incident. Offender Abernathie called 573-200-4728 and spoke with an unknown male. He said he was getting ready to go to the hole for a long time because staff tore up his pictures and told him, 'fuck you. You don't matter you're an inmate." He said the officer who called him a "dumb ass" was standing there directing him to hang up the telephone. He also said they "think they are going to cuff me up now." Abernathie then abruptly ended the call. On 12/25/2021, Abernathie called telephone number 573-200-4728 and spoke with an unknown male. Abernathie told him that staff beat him and pepper sprayed him. Both telephone calls were downloaded to a CD and placed in the case file. A list of the calls was placed in the case file. **(TAB B)**

On 10/29/2021 at 10:20 AM, I conducted an audio-recorded interview with **Offender Dwight Abernathie #1076917** in the HU 7 classification office at ERDCC as a witness.

Offender Abernathie stated last night (10/28/2021) someone kicked a "car" (prison retrieval device) under his cell door. A short time later CO Messersmith came to his cell door and called him a "dumb ass." Abernathie said that started a verbal altercation between him and Messersmith because Messersmith stated they were always dealing with him. Abernathie said the previous week Messersmith and Sgt. Hart had counseled his cellmate but they had never spoken to him. Abernathie said he told Messersmith he should not speak to offenders that way. He claimed Messersmith and the other officer (Spradling) directed him to exit the cell and wait in the sally port while they searched his cell. Abernathie complied and he complained to the control room officer (Tifenauer) about Messersmith. When he returned, he discovered a photograph previously on his wall was torn in two.

CO Tifenauer told Abernathie that Sgt. Hart wanted to speak with him. When he arrived in the sergeant's office, Hart told him he would receive a conduct violation for the "nuisance contraband" discovered in the cell. Abernathie said he asked Hart about his torn photograph and Hart told him, "You're just a fucking inmate. You don't matter." Hart was yelling at him and told him to "shut his fucking mouth" and return to his cell. Abernathie said he walked back toward the cell but he thought Hart was going to "lock [him] up" (place him in segregation) so he called his family. A few moments later Abernathie said Messersmith and Spradling told him to "lock down (return to his cell)." Abernathie stated he hung the telephone up and began walking toward his cell with both officers walking behind him. He said while walking toward his cell, Messersmith sprayed him in the back of the head with pepper spray. Abernathie said he walked around the tables toward the showers and the officers possibly told him to "cuff up."

3

*Improving Lives for Safer Communities*    Abernathie v Hart et al 000487



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

Abernathie said Hart entered the wing; he evaded him then was pepper sprayed in the facial area. He made it to the showers and turned the water on to wash away the pepper spray.

He stated the next thing he knew Hart said "10-5 on the radio" entered the shower then struck him in the face and the back of the head with an unknown item that had a "shine" to it. Abernathie felt like he was being "stabbed." He raised his hand up to block the strikes but was stabbed in the finger. Abernathie thought, "this motherfucker is trying to fucking kill me." He could hear Hart telling the staff to get him down. Abernathie said he was trying to stay upright, as he feared Hart would beat him worse inside of the shower where there are no cameras. Abernathie backed out of the shower and laid down on the floor. He claimed he could "feel feet stomping" him and he heard Hart repeatedly yelling, "break a finger." Abernathie could feel someone grabbing his fingers and he did not understand why staff wanted to break his fingers. He stated it made more sense when he later received the conduct violation from Hart stating Hart had broken fingers. He later recalled Hart was on top of him and other staff told him they had control of Abernathie and Hart could get off him but Hart refused saying, "Fuck no! Fuck no!"

Abernathie said he was struck repeatedly with an object. He was not sure if it was the pepper spray can or possibly a handcuff. He estimated that he was struck approximately twenty times. He claimed the injuries to his face and head were due to being struck with the object. He denied striking staff or attempting to strike staff.

He stated Hart was "extremely" angry and described Hart as "completely out of control." Abernathie said he should have complied with directives but he believed the staff were "extreme" in their actions toward him.

I asked him about the telephone call he made prior to staff entering the wing. He said he was angry staff damaged his property during the cell search and he told his brother-in-law that the staff "thought" they were going to restrain him. He admitted he intended to disobey directives to submit to restraints but he adamantly denied any physically aggressive behavior toward any staff member. I read him the statement from staff alleging he "swung his elbows back in an attempt to strike Sgt. Hart." Abernathie stated he never swung his elbows at anyone and the wing camera pointing toward the shower would verify he was telling the truth.

Abernathie stated he suffered injuries to his right wrist when Hart applied pressure to his wrist. He said his left index finger and left side of his face suffered "puncture" wounds from the unknown object. He also stated he had multiple cuts on the back of his head. Abernathie said the injuries to his right eye, right cheek and to his head were from being repeatedly struck with a closed fist. Abernathie stated the left side of his rib cage and his lower jaw could be broken. He said his injuries were not treated as medical staff assessed him through the cell door after the incident. Abernathie added, "That was a hell of an ass whooping over nothing." (It is of note

Improving Lives for Safer Communities
Abernathie v Hart et al 000488



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

immediately following the interview, I took 35 photographs and video footage documenting Abernathie's injuries. I also took 10 photographs of the D-wing shower area. The photographs with photo log **(TAB C)** and video footage were placed in the case file.)

This concluded the interview. A written statement was obtained and consistent with the information he provided during the interview. **(TAB D)**

After the interview, Offender Abernathie was taken to medical for a detailed evaluation. Nurse Practitioner (NP) Brett Ferguson called me and said he observed the following possible injuries: A possible "jaw fracture" to the lower mandible as well as the "TMJ" (hinge) joint, possible "right orbital fracture", possible "fractured rib" and he also observed significant bruising to Abernathie's jaw and facial area.

On 10/29/2021, Sgt. Manche, Sgt. Hart and CO Spradling were placed on no offender contact status and CO Messersmith was placed on utility relief by Major McFerron. **(TAB E)**

On 11/01/2021, four anonymous letters were forwarded to me from the ERDCC Warden's office. The letters all stated they witnessed Sgt. Hart utilize excessive force on Abernathie and that the authors were afraid of retaliation from custody staff. Each letter appeared to have different handwriting. The letters were placed in the case file. **(TAB F)**

On 11/18/2021, I requested Abernathie's medical records from 10/28/2021 through 11/18/2021. **(TAB G)** The medical records revealed upon further testing it was determined Abernathie suffered bruising as a result of the incident but no fractures. **(TAB H)**

On 12/15/2021, Investigator II (INV II) Zackary Whitehead reported Sgt. Hart approached him at the local Wal-Mart on 12/14/2021. According to Whitehead's report, Hart told him that he was "disgruntled" due to being the subject of an investigation for a use of force at ERDCC. Hart told him he followed an offender into the shower and struck the offender in the back of the head. Hart told Whitehead the offender attempted to strike him with an elbow so Hart repeatedly struck the offender. Hart also brought up his own medical records verified he was not holding restraints while striking the offender.

Hart further told Whitehead he knew he would be asked to take a CVSA but thought he would fail the examination because he is "mad." Hart also told Whitehead he was "not good" for this incident but believed he would be fired. This concluded the report. The report was placed in the case file. **(TAB I)**

On 02/09/2022, I requested training records for Sgt. Hart, Sgt. Reckert, Sgt. Manche, COs Armbruster, Messersmith and Spradling. All of their use of force and defensive tactics training was current. A copy of their training records were placed in the case file. **(TAB J)**

*Improving Lives for Safer Communities*    Abernathie v Hart et al 000489



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

On 02/09/2022, I requested Hart's, Manche's, Messersmith's, Reckert's and Spradling's state email accounts from 10/01/2021 through 02/09/2022. There were no emails located that pertinent to this investigation. However, the examination revealed Hart sent and received over 134 non-work-related communications. Manche sent and received at least 32 non-work-related communications and Spradling sent one non-work-related email with attached personal photographs. **(TAB K)** This conduct will be referred to the CAO to be addressed as a supervisory issue.

On 03/09/2022, I requested post order acknowledgement sheets, search logs and chronological logs for HU 7 on 10/28/2021. These reports were reviewed and appeared to be complete. These reports were placed in the case file. **(TAB L)**

On 03/10/2022, at 5:53 AM, I conducted an audio-recorded interview with **CO Gary Tiefenauer**, in the investigations office at ERDCC as a witness.

CO Tiefenauer said on October 28, 2021, he was working in the "bubble" (HU 7 control room) He stated CO Edwin Messersmith attempted to pepper spray an offender (Dwight Abernathie), but he missed. After he missed, there was a "fast walk" with the offender around a table; CO Dennis Spradling then utilized his pepper spray, and he actually hit the offender. Then the offender did another "fast walk" around the table, and Sgt. Hart entered the wing. He said the offender started to leave the area. Hart tried to cut the offender off, but he was not successful and it appeared to him, Hart deliberately turned his body, so the offender could get to the shower. The offender went to the shower, to probably wash the pepper spray off himself. Hart, Spradling, and Messersmith went into the shower after the offender.

A short time later, it looked like the offender came out of the shower, but he tripped on his way out. Tiefenauer could not see what happened inside the shower. The three officers then "dog piled" on the offender, put restraints on him, and that was the end of it. Tiefenauer did not remember the offender's name. I asked if Tiefenauer remembered the offender telling him that Messersmith had been calling him a "dumb ass." Tiefenauer did not recall having that conversation. Tiefenauer said he never worked with Messersmith in a wing so he did not know how he spoke to offenders. I asked if he ever heard Hart cursing at offenders; Tiefenauer said he heard Hart say things like "damn it and shit" to offenders, but he never heard Hart calling them names.

Tiefenauer said he did not do a UOF report on the incident, because he did not feel that he was involved in it. He only witnessed a part of it (the pepper spraying). I informed Tiefenauer that anyone who witnesses a UOF is also required to write a UOF report. Tiefenauer did not tell his supervisor that he witnessed a part of the UOF.

I asked Tiefenauer if he saw Offender Abernathie after the UOF. Tiefenauer said he did see him, but it looked like the offender "had been roughed up pretty good." I asked if Tiefenauer

Improving Lives for Safer Communities

Abernathie v Hart et al 000490



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Waggaraner INV II
04/25/2022

believed Abernathie's actions warranted the level of force employed.  Tiefenauer said based upon the part of the UOF he saw, he did not believe the level of force was warranted.

Tiefenauer did not hear an officer say to break the offender's fingers.  Tiefenauer did not see Offender Abernathie do anything to an officer.  Tiefenauer did not see an officer strike the offender with a pair of handcuffs.  Tiefenauer never heard Hart use the word "fuck" to an offender.  Tiefenauer has heard Hart jokingly belittle co-workers, such as Hart calling him a "dumb ass" one time, but he said Hart was smiling when he said it.

Tiefenauer later recalled the officers searching Abernathie's cell had torn a photo when they took it off the wall.  I told Tiefenauer that Abernathie said he spoke with him about the officers destroying some of his property, and Tiefenauer told him to report it to a sergeant.  Tiefenauer said he may have said this, because it would have been procedure for him to direct Abernathie to the sergeant.  Tiefenauer did not hear Hart yelling at the offender.

Tiefenauer thought the UOF happened because Abernathie was told to lock down, and he kept refusing to do it.  Instead, Abernathie walked over to the table like he was going to watch TV; he also remembered seeing Abernathie on the phone and he refused to get off the phone.  I asked if Tiefenauer thought excessive force may have been used in this incident.  Tiefenauer said "probably so", then clarified he based his opinion only upon the cuts he saw on the offender's head.  Tiefenauer said none of the officers involved had spoken to him about the UOF.

I asked if Hart seemed to be friendly with certain gang members.  Tiefenauer said Hart talked to gang members, but it was usually only to get information about drugs in the facility.  He never saw Hart acting suspicious with gang members.  I asked Tiefenauer if he knew what caused the cuts to the back of Offender Abernathie's head.  Tiefenauer said they may have come from a pair of handcuffs.  However, Tiefenauer did not hear any of the officers talking about hitting the offender with any handcuffs.  He did hear Sgt. Hart talking about having injured his hand during the incident.  Tiefenauer did not remember hearing Messersmith cussing at offenders.

This concluded the interview. Tiefenauer provided a written statement, and it was consistent with the information that he provided during the interview.  The statement was placed in the case file (**TAB M**).

On 03/10/2022, at 7:13 AM, I conducted an audio-recorded interview with **CO Donald Armbruster**, in the investigations office at ERDCC as a witness.

CO Armbruster was working on the yard on October 28, 2021.  He responded to some officers needing help in the wing, but he did not know exactly where the officers were located.  He was later told they were in the shower.  By the time he arrived at the shower, Sgt. Reckert had also

*Improving Lives for Safer Communities*    Abernathie v Hart et al 000491



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

arrived in the area.  There were a lot of people in the shower.  The offender was pinned in the back corner of the shower, and he had one arm free.  Sgt. Reckert attempted to grab the offender's foot, but he could not do it.  Sgt. Reckert then tried to grab the offender's leg for a second time; however, at this time, everyone tumbled out of the shower.  Armbruster got down on the ground and grabbed the offender's legs, in order to help maintain control of the offender.

The offender placed his arms behind his back. The officers managed to put restraints on the offender's hands, and Armbruster helped put restraints on the offender's legs along with CO Spradling.  The offender was raised to his feet, and he said, I'm, done, I'm done."

Armbruster stated the offender was escorted to A-wing, and he observed some items left on the floor.  Armbruster helped pick up the items, and he then responded to help strip the offender out in a cage.  Armbruster did not know which officer put the handcuffs on the offender.

Armbruster wondered how everyone wound up in the shower, until he saw video of the incident.  The only thing Armbruster saw was the offender trying to swing with his free hand and put "elbow hammers down." Armbruster further stated he observed somebody with a set of restraints in their hand was trying to pin his (Abernathie's) arm against the wall." He said at this time, Sgt. Reckert tried to grab a leg, and Armbruster's attention went to the offender's feet.

Armbruster did hear officers yelling at the offender to put his arms behind his back and stop kicking.  He said the offender kicked him in the stomach area, but he was not injured from it, other than some bruises.  Armbruster believed the offender was high on something, because he was feeling no pain.  He said the offender was a very large and tall man, so it was hard to control him, especially with him resisting the officers.  Armbruster did not hear any officers saying to break the offender's fingers.  He did see some "contusions" on the offender's face after the incident.  He did not notice any other injuries to the offender.  Armbruster did not see any excessive use of force being used, whenever he arrived in the area.  However, he could not attest to what happened before he got to the area.

This concluded the interview.  Armbruster did not provide a written statement, as he previously provided a report of incident detailing what he observed.

On 03/10/2022, at 7:25 AM, I conducted an audio-recorded interview with **CO Joshua Ruble**, in the investigations office at ERDCC as a witness. Ruble was listed as a wing officer.

CO Ruble stated he never worked for Sgt. Hart and did not remember the UOF on October 28, 2021.  He was not in the housing unit that night and did not know Offender Abernathie.  This concluded the interview. Ruble had no relevant information for this investigation, so he did not provide a written statement.

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000492



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

On 03/10/2022, at 7:30 AM, I conducted an audio-recorded interview with **CO Edwin Messersmith**, in the investigations office at ERDCC as a witness.  Messersmith requested a co-worker representative, (CO Kurt Weiss #E0148612) who was present during the interview.

CO Messersmith said he was supervised by Sgt. Carl Hart.  He stated he is not personal friends with Hart outside of work, but Hart is a listed friend on Messersmith's social media.  Messersmith stated he has a lot of co-workers listed as friends on social media.

Messersmith is currently on a "no Ad-Seg status" and believed he was on this status, in order to keep him away from any further questionable uses of force. Messersmith has been involved in one UOF since the incident with Offender Abernathie.

I asked what happened during the UOF against Abernathie.  Messersmith said on that night, he observed a "Cadillac" (string) go from one cell to Abernathie's cell.  This prompted him to do a cell search of Abernathie's cell with another officer.  Messersmith then pulled Abernathie and his cellmate out to do a cell search.  Abernathie had some pictures taped to his wall with sticky tack.  The officers took the pictures off the wall, and this made Abernathie upset as there was damage done to the pictures as they were taken off the wall.  Abernathie requested to speak to a supervisor about the matter.

Messersmith said he made Sgt. Hart aware of Abernathie's request, so Abernathie was directed to come to the back office.  While in the office, Abernathie became loud and argumentative with Sgt. Hart.  Hart told Abernathie it was against the rules for him to have things on his wall.  Abernathie did not like being told this, and was directed to return to his wing.  Abernathie then exited the back office and went to his wing.

Messersmith was later in another wing, and he heard the module officer directing an offender in D-wing to get off the phone.  Messersmith responded to the D-wing and found Abernathie on the phone.  Because Abernathie had been acting "aggressively" over his earlier cell search, Messersmith asked CO Spradling to come with him, in order to tell Abernathie to get off the phone.

When the two officers arrived in the wing, Abernathie was still on the phone.  Messersmith directed Abernathie to hang up the phone, because recreation time was over.  Abernathie ignored the directive, and continued to talk on the phone.  Abernathie ignored two more directives to hang up the phone.  Messersmith then told Abernathie to submit to restraints, and Abernathie said, "You're not going to lay your hands on me, you better call for your CERT Team.  If you touch me, I'm going to hurt you."

At that point, Abernathie started to walk toward his cell.  Messersmith pulled his pepper spray canister out, in case Abernathie decided to get physical with him.  Abernathie then refused to go into his cell.  Messersmith utilized his pepper spray toward Abernathie, but Abernathie had

9

Abernathie v Hart et al 000493



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagga010er INV II
04/25/2022

his back toward Messersmith.  Therefore, the pepper spray hit Abernathie in the back of his head.  Messersmith once again told Abernathie to submit to restraints, but he refused.

Abernathie then started pacing faster and faster around the wing.  He appeared more upset.  Abernathie started walking around some tables, and he walked past Messersmith.  Abernathie was given one more directive to submit to restraints, but he refused.  CO Spradling then utilized MK-9 pepper spray toward Abernathie, and called for Sgt. Hart, who responded to the wing.

Messersmith, Spradling, and Hart tried to get Abernathie cornered, so he would submit to restraints.  Hart also directed Abernathie to submit to restraints, but he refused.  Instead, Abernathie headed to the shower.  Once inside the shower, Abernathie turned on the shower, and he was "readying himself to fight."

He said Hart looked into the shower and told him and Spradling that it looked like Abernathie was not going to go down without the officers having to be physical with him.  Hart then called a "10-5" (officers needing assistance).  Before assisting officers arrived, Hart went into the shower, followed by Spradling.  Messersmith said he was the third man into the shower.

Messersmith said that Sgt. Hart was on the offender's left side and Spradling on his right side.  Abernathie was facing the wall when they went in the shower.  Hart and Spradling are bigger in size than Messersmith.  Since Messersmith was the third man in, he grabbed for his cuff pouch, thinking that Abernathie was now going to cuff up.  However, when Abernathie realized the officers were in back of him, he put his hands against the wall, refusing to put them behind his back.  Abernathie then tried to "kick back" and push the officers off of him.

Since the bigger officers were to the sides of Abernathie, Messersmith reached over their shoulders, and put his hand on the center of Abernathie's back.  Messersmith and the other officers then tried to put Abernathie against the wall.

At this point, Abernathie started throwing his elbows back at the officers.  Messersmith then tried to get a hold of one of Abernathie's legs, in order to pull it back and get him to the floor.  However, Abernathie was covered with pepper spray, so his leg kept slipping out of his hand.  Messersmith said at this point, Hart's and Spradling's eyes were almost closed from the pepper spray.

Messersmith stated that Sgt. Reckert then arrived in the shower.  He believed that Reckert got wedged between the offender and the wall, and everyone fell back against the wall.  Messersmith then hit his back on the shower hook as the struggle with the offender went to the floor.  Messersmith said he took hold of Abernathie's legs; he crossed the legs and tried to keep them contained.  Sgt. Tyson Manche, Sgt. Reckert, and Sgt. Hart now had control of Abernathie's arms.

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000494



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Waggaaner INV II
04/25/2022

Messersmith pulled his cuffs out, in case they were needed to restrain the offender. CO Spradling left to get leg restraints, and CO Armbruster assisted Messersmith in holding Abernathie's legs. When Spradling brought the leg restraints back, Messersmith and Armbruster applied them to Abernathie as other officers applied the wrist restraints on Abernathie.

Messersmith said Hart and Spradling were "pretty banged up," so Messersmith walked to the suicide cell where Abernathie was being taken. The officers escorting Abernathie requested safety scissors to cut off Abernathie's shirt. Messersmith found safety scissors for them, and the officers secured Abernathie in a cell. Messersmith said that ended his involvement in the incident.

I asked Messersmith to describe how Abernathie's pictures were damaged when he took them off the wall. Messersmith said it was hard not to damage them, because they were put up with sticky tack. He said the pictures were only J-Pay black and white printouts. Messersmith denied calling the offender a "dumb ass," and Messersmith stated he does not speak that way to offenders. Messersmith said he tried to be professional at all times and he has never called an offender any name. He has never heard Sgt. Hart calling offenders names during the three or four months he worked with him. Messersmith did not spend a lot of time in the supervisor's back office, so he was not around Hart very much.

Messersmith believed he was not included on the no offender contact status, because the other officers (Hart and Spradling) had injuries to them, which suggested they had some sort of physical contact with Abernathie. Messersmith said he had no physical contact with the offender, other than trying to grab his legs.

I advised Messersmith he was not named as causing the injuries to Abernathie, but some other officers were named. However, I stated he was a witness to the details of the event. I asked him if he witnessed any officers inflicting injuries to Abernathie, and if he did anything wrong, himself. Messersmith did not see any officers inflicting injuries to the offender. Messersmith said the only thing he did wrong was to pepper spray Abernathie in the back of his head, instead of a frontal area.

I then showed video of the incident to Messersmith. I asked if Hart told Abernathie in the back office, that he was just a "fucking inmate and he did not matter." Messersmith denied that Hart said that to Abernathie. I asked Messersmith why he did not write Abernathie a violation for threats, due to Abernathie saying he would hurt Messersmith if he touched him. Messersmith said he decided to write him a violation for creating a disturbance. Messersmith said he did not apply pepper spray to the proper target area because he thought Abernathie would face him, when he first pulled his pepper spray.

Improving Lives for Safer Communities

Abernathie v Hart et al 000495



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

I asked Messersmith to show me how Abernathie was able to elbow the officers when he was up against the wall. I then documented Messersmith while he showed me how Abernathie accomplished this during the struggle. I told Messersmith his UOF report about the elbows being thrown, did not match what he said today. Messersmith then agreed he did not actually see Abernathie's elbows making contact with an officer; he only saw Abernathie throwing his elbows backward. Because of Messersmith's location during the struggle, he agreed he only assumed Abernathie actually made contact. However, he said Hart and Spradling were making faces like they were in pain, whenever Abernathie was throwing his elbows back toward the officers.

I asked if Messersmith if he saw an officer throw any blows or distraction techniques toward Abernathie. Messersmith believed that Sgt. Manche performed one distraction technique to Abernathie's ribs. Messersmith only saw officers reaching for the offender's arms. Messersmith he did not see an officer with handcuffs in his hand.

I showed him the video surveillance footage and, Messersmith showed me how he was trying to get a hold of Abernathie's legs. He thought there were enough officers to handle the offender's arms. He did not believe Hart was angry when he entered the shower. Messersmith did believe Hart was concerned about Messersmith's inexperience in putting a struggling offender into restraints.

I showed Messersmith some photos of Abernathie's injuries. He stated Abernathie did not have the head injuries before the use of force. Messersmith reiterated he was focused on the offender's back and legs and he did not see what was going on with the rest of the offender's body. Messersmith assumed the facial injuries might have resulted if the offender was pushed into the wall too much; however, he could not see what was going on with the offender's face during the struggle. I asked if he felt Abernathie deserved the kind of treatment he received. Messersmith said both Abernathie and staff received injuries. Messersmith reiterated he did not see Sgt. Hart striking the offender in his head or face. Also, he did not see anyone hitting the offender with a pair of handcuffs. Messersmith stated he did not actually see Sgt. Manche strike the offender one time with a distraction technique; he was told this after the incident. Messersmith did not know how Hart hurt his hand. Messersmith stated he has known CO Spradling for a while outside of work, but they do not talk on a regular basis. Messersmith said he would be willing to take a Computer Voice Stress Analyzer (CVSA) examination.

This concluded the interview. CO Messersmith provided a written statement, and it was consistent with the information that he provided during the interview. The written statement was placed in the case file. (**TAB N**).

Improving Lives for Safer Communities



**MISSOURI DEPARTMENT OF CORRECTIONS**
**Office of the Director**
*Office of Professional Standards*

2021110034-C112198
Darrell Waggoner INV II
04/25/2022

On 03/10/2022, at 8:31 AM, I conducted an audio-recorded interview with **Sgt. Robert Reckert**, in the investigations office as a witness. Reckert requested a co-worker representative (Sgt. David Wallace) who was present during the interview.

CO Reckert said on October 28, 2021, he was working a regular shift between 7:00 PM to 12:00 AM, before he could start his classes as a firearms instructor. During the shift, he heard a call for help from some other officers in HU 7. He responded to the call, and found out the struggle was in the shower. When he arrived at the shower area, he found Messersmith, Spradling, and Hart in a struggle with an offender.

Reckert said he could not remember the offender's name, I advised the offender's name was Abernathie. Reckert recalled the shower was running at the time, and believed the officers had already deployed pepper spray to the offender. However, the officers could not get wrist restraints on the offender, due to the "wetness of the shower."

Reckert said various officers were trying to grab the offender's arms, so Reckert decided to restrain the offender's legs. Reckert's said his eyes reacted to the pepper spray being splashed by the water, but he did not let go of the offender's legs. During the struggle, the officers and the offender fell out of the shower. CO Armbruster pulled Reckert up to his feet. At this time, officers were able to gain enough control of the offender, to allow them to pull the offender into the wing and onto the floor.

Reckert said he was drenched in OC (Oleoresin capsicum) pepper spray, and he "was on fire." He could tell the pepper spray also blinded other officers. Reckert decided to shift his movement to the top half of the offender, and he "tagged out" Sgt. Hart, so that Hart could let go. The offender then had handcuffs and leg restraints applied. The offender was assisted to his feet and taken to a cell for observation. The offender was placed on the floor, his clothes were removed, and a tether was applied. Reckert then backed out of the cell, removed the handcuffs from the offender, secured the tether, and closed the "chuck hole" (food port).

I asked if Abernathie's hands were on the wall in the shower. Reckert could not really remember, but he knew the offender's hands were high on the wall while moving them around, in order to prevent him from being restrained.

I asked if he saw Abernathie "elbow" anyone; Reckert replied, "No," because he could hardly see from the pepper spray being on his face. Reckert also went "low" on the offender; because he saw, other officers go "high" on him. Reckert was trying to prevent the offender from kicking anyone. Reckert did not see an officer strike Abernathie in the head or face with a closed fist or with a set of restraints.

During the struggle, Reckert did pull out his black CERT (Corrections Emergency Response Team) restraints from his duty belt. However, he then observed other officers already had

13

Abernathie v Hart et al 000497



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

restraints out, so he tossed his aside.  An officer later picked them up and gave them back to him.  Reckert said he also lost his hat during the struggle.

I asked if he saw any officer strike Abernathie.  Reckert said he saw Sgt. Manche strike Abernathie in the rib cage one time.  He thought it was on the right side of Abernathie. Manche used this technique, so handcuffs could be applied.  The offender complied after this technique was used on him.

Reckert said he noticed the offender had sustained some injuries to his head.  Reckert also believed the offender received some strikes to his head, due to fighting the officers in the shower. Reckert said the injuries were not life threatening.  Reckert did not hear any officer yelling to break Abernathie's fingers.  Reckert said the whole wing was yelling, but he was not focused on anyone using curse words at the offender.  He believed there may have been some curse words being used, but he was not paying attention to this.  Reckert did not know whose restraints were used on the offender.

I then showed Reckert video footage of the event.  I asked him if any strikes to the rib cage were justified.  Reckert said, "Yes, we could not get the offender to cuff up."  I asked if he thought excessive force was used on the offender.  Reckert did think some possible excessive force was used on the offender's face and head areas, but he did not personally see any officer strike these regions.

I asked if he knew of any injuries to the officers.  Reckert knew that Sgt. Hart received an injured hand.  He also knew that Messersmith sustained a wound on his back from the struggle in the shower.

This concluded the interview. Reckert provided a written statement, and it was consistent with the information that he provided during the interview.  The written statement was placed in the case file. (**TAB O**).

On 03/10/2022, I submitted a request to Investigations Manager Dye via the chain of command to conduct CVSA examinations on CO Messersmith, CO Spradling, Sgt. Manche and Sgt. Hart during their investigative interviews. The request was approved. **(TAB P)**

On 03/10/2022, I also obtained an Accident Cause Evaluation (ACE) form from ERDCC personnel for Sgt. Hart, CO Spradling and CO Messersmith regarding this incident. Hart stated he struck his right hand "against something and smashed it." Messersmith said that during the use of force he struck his back against a "shower hook." Spradling stated he struck his left knee on the ground during the use of force. These forms were placed in the case file. **(TAB Q)**

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000498



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

On 03/11/2022, at 6:22 AM, I conducted an audio-recorded interview with **CO Dennis Spradling**, in the investigations office as a subject. Spradling requested a co-worker representative. Sgt. Krystal Mishler was present during the interview.

CO Spradling recalled, Messersmith attempted to lock down D-wing in HU 7 but the offender on the telephone (Abernathie) refused all directives to return to his cell. Messersmith told Abernathie to "cuff up" but he refused and Messersmith applied pepper spray to Abernathie's "facial area." He later clarified it was "mostly the back of his head." Spradling stated Abernathie continued to disobey directives therefore; he administered pepper spray to Abernathie's facial area. He said Hart entered the wing and Abnernathie went to the shower. He said a "10-5" (officer needs assistance) was called via handheld radio as Hart, Messersmith and Spradling entered the shower to restrain Abernathie.

Spradling stated he attempted to gain control of Abernathie but he refused all directives therefore, Spradling applied "distraction techniques to his right side." Spradling clarified he struck Abernathie "with a closed fist to the right side ribcage area." Spradling stated he struck Abernathie "five or six" times because Abernathie was "combative and refusing to comply with directives." Spradling said Abernathie was "combative" because he threw his elbows toward staff. I asked Spradling to demonstrate how Abernathie was able to face away from them and throw elbows toward staff. Spradling demonstrated what happened and I documented his actions. He denied striking Abernathie in the head or face. He did not know how Abernathie threw his elbows and did not strike any staff members while the four of them were in such a confined area. He was focused on gaining control of Abernathie and did not observe him strike anyone. Spradling claimed he did not see anyone strike Abernathie in the head or facial area. He said other staff responded and they ended up on the dayroom floor. Spradling became contaminated with pepper spray and he could not see therefore other staff relieved him.

I asked why Abernathie was upset with them for searching his cell and if any of his property was damaged during the search. He did not know why and he could not recall if any property was damaged during the search.

Based on his vague answers it appeared Spradling's responses were somewhat rehearsed therefore I asked if he had spoken with Sgt. Hart about this incident prior to this interview. He claimed he did speak with Hart after the incident happened but he has not spoken to him about it since then. I reminded Spradling MODOC policy required he be completely honest and forthcoming during investigative interviews.  Spradling stated he was being honest.

Spradling denied witnessing Hart or Messersmith speak unprofessionally to offenders. He also denied speaking unprofessionally to the offenders. I showed Spradling the video surveillance footage and he identified himself as well as the other staff who were present.

Improving Lives for Safer Communities
Abernathie v Hart et al 000499



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Waggaaner INV II
04/25/2022

CO Spradling was asked to take a CVSA examination to verify his responses to my questions were completely accurate. Spradling voluntarily agreed to take the CVSA examination.

During the pretest interview he continued to maintain that he did not witness anyone strike Abernathie because he was focused on what he was doing. Spradling repeatedly stated the staff were trying to "gain compliance" from Abernathie. Spradling further claimed he did not know how Abernathie received the injuries to his head. He did agree the injuries to Abernathie's head appeared to be excessive. He drew the placement of each person in the shower and continued to claim he did not seen anything. The drawing was placed in the case file. **(TAB R)**

Spradling's answers to the relevant questions showed "Deception Indicated." The CVSA examination is detailed in an attached CVSA supplemental report.

Upon further questioning (time stamp 1:05:43 of the interview), Spradling asked if his witness could leave the room. Sgt. Mishler exited the investigations office. Spradling sighed and said, "Okay, look. I don't like talking around people it makes me nervous. I'm already nervous that I'm up here on this shit." Spradling said Hart did tell him about questions investigators "usually ask." Spradling reiterated, "I really don't know what happened to his head." He said, "I know he possibly hit him in the ribs at the same time I did." He said it again, "I know he hit him." Spradling admitted, "I know I hit him too many times too." Spradling said, "Five or six times is a little bit too much." He admitted he spoke unprofessionally to offenders in the past but claims he is respectful to offenders when they are respectful toward him.

Spradling said the offender was pulling his elbows away but he could not tell if the offender was attempting to strike anyone. I asked if he thought Hart was angry with the offender and he replied, "I think at this point all of us were pretty pissed off."

This concluded the interview. A written statement was obtained and was consistent with the information he provided during the interview. **(TAB S)**

On 03/11/2022, I requested approval via the chain of command to submit the photographs documenting Abernathie's injuries for forensic analysis to determine if Abernathie's injuries were caused from being struck with an object or if his injuries were consistent with being struck by a closed fist. Investigation Manager Dye approved the request.

On 03/15/2022, at 6:57 AM, I conducted an audio-recorded interview with **Sgt. Tyson Manche**, in the investigations office at ERDCC as a subject.

Sgt. Manche stated on 10/28/2021, he responded to a 10-5 in HU 7 from the medical unit. He entered the sally port and observed feet in the shower stall. When Manche entered the wing, he observed Sgt. Hart in the back left corner of the shower. He did not recall where Spradling

*Improving Lives for Safer Communities* Abernathie v Hart et al 000500



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Waggaener INV II
04/25/2022

and Messersmith were. He observed the offender bent over at the waist facing the wall with his arms "flailing" and it appeared the officers were also "flailing" their arms. He could not tell if staff were attempting to "grab him or hit him" but he assumed they were trying to grab Abernathie.

Manche said they were able to get Abernathie to the floor in the dayroom. He remembered Hart was "straddling" the offender's back and attempting to control the left arm. Manche stated Reckert attempted to control the offender's right arm but the offender was resisting. Manche stated he then, "utilized two distraction techniques in the form of closed fist to his right rib cage in an attempt to get him to put his arm down." Manche said he was not sure how hard he struck the offender because other staff were in the way but Reckert was able to gain control of Abernathie's arm after Manche utilized the distraction techniques.

He further recalled they were able to restrain Abernathie and Manche "10-6 the 10-5" via his handheld radio (notified others the situation was under control). He noticed Hart was "squinting" his eyes repeatedly and appeared to be struggling to see so Manche took control of Abernathie from Hart. He said staff escorted Abernathie to a cell and strip-searched him without further incident.

I asked why he was placed on no offender contact following this incident. Manche said he really did not know because he reported everything he did. However, he thought it could be because of what transpired in the shower before he arrived. He recalled "somebody" (could not remember who made the statement) said Hart struck the offender, "with a pair of wrist restraints in his hand." Manche said Hart told him a short time later about the allegations of Abernathie being struck with restraints.

Manche stated he was taught during defensive tactics training he could utilize distraction techniques to secure an offender and he believed at the time it was the best course of action to subdue the offender.

I showed Manche the video footage of the incident and he positively identified himself as being present. Manche maintained the offender was actively struggling when he utilized the distraction techniques to secure the offender. He reiterated distraction techniques are taught by the MODOC, during defensive tactics training and securing an offender is an authorized use of distraction techniques. He stated he used the minimum amount of force necessary to gain compliance from the offender. Manche further explained his use of the distraction techniques stating, "They pepper sprayed him and that didn't work. They took him to the ground and that didn't work. He was actively resisting…"

Manche added, he would not have utilized any more distraction techniques on Abernathie. He explained if two strikes would not have worked it stands to reason any further strikes would not have been effective. Manche compared it to utilizing pepper spray and said if one or two

17

Abernathie v Hart et al 000501



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

applications of pepper spray were not effective it was likely additional applications would have the same result.

He also admitted to utilizing the state email system for personal business and he is aware he is not allowed to do so. This will be addressed as a supervisory issue at the conclusion of this report.

This concluded the interview. A written statement was obtained and it was consistent with the information he provided during the interview. **(TAB T)**

On 03/15/2022, at 7:43 AM, I conducted a second audio-recorded interview with **CO Edwin Messersmith**, in the investigations office at ERDCC as a witness.  Messersmith requested a co-worker representative (CO Kurt Weiss #E0148612) was present during the interview.

CO Messersmith stated he would voluntarily take a CVSA examination. During the pretest interview he continued to maintain he did not witness anyone strike Abernathie because he was focused on what he was doing. He did not know how Abernathie received the injuries to his head.

Messersmith's answers to the relevant questions showed "Deception Indicated." During the posttest examination, he admitted he could see staff moving their arms toward the offender but maintained he could not see the offender being struck. The CVSA examination is detailed in a supplemental report. Messersmith submitted a written statement. The written statement was consistent with the information he provided during the interview and placed in the case file. **(TAB U)**

On 03/17/2022, I showed photographs (#448,462,469,471, 13, 14, 15, 19, 20,28,31,32 and 40-45) of Abernathie's injuries to Forensic Pathologist Doctor (Dr.) Russell Diediker. Dr. Diediker is currently the pathologist utilized by the MODOC in the Eastern Region. He was asked if he could determine from the photographs if Abernathie was struck with an object. Dr. Dieidiker stated he could not positively determine if Abernathie was struck with an object. However, he stated photograph 448 (469, 471, 40, 41) appeared to be an "incised wound." Diediker explained an incised wound is produced by a sharp edge and is usually longer than it is deep such as the wound documented in photograph 448 of Abernathie's right cheek. He said photograph 28 of the back of Abernathie's head also appeared to possibly be an incised wound but it was difficult to determine due to the amount of hair covering the area. Diediker also explained photographs 14 and 15 were a laceration, which is the jagged tearing of the skin such as a blow from a fist, and a bruised eye both injuries likely results of blunt force trauma with no sharp or metal object present. Dr. Diediker stated it was "absolutely" possible that the incised wounds to Abernathie's face could have been caused by a set of wrist restraints. However, he reiterated without physically examining the wounds himself, he could not provide a definitive cause.

18



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

On 03/22/2022, at 6:27 AM, I conducted an audio/video-recorded interview with **Sgt. Carl Hart**, in the investigations office at ERDCC as a subject. Hart requested a co-worker representative (Sgt. Tory Pickett) and he was present during the interview.

Sgt. Hart recalled the incident in HU 7. Hart stated Abernathie was non-compliant with staff directives to submit to wrist restraints even after being pepper sprayed. He remembered Abernathie went to the shower and turned on the water continuing to disobey directives from staff. Hart stated custody staff entered the shower and Abernathie was "combative." He claimed Abernathie was "attempting to strike at staff." Hart further related staff were able to remove Abernathie from the shower then place him on the ground and restrain him.

He later recalled that Abernathie was facing the back of the shower with his back to the shower entrance when staff arrived. Hart said when they attempted to gain control of Abernathie, he started "striking downward" with his elbows while still facing the back of the shower.

Hart said he was injured during the altercation. Hart stated he "fractured [his] right ring finger at the knuckle." (Commonly known as a boxer's fracture.) **(TAB V)** Hart stated he has recovered from his injuries. Hart also stated he is "right handed" but was able to do a few things with his left hand including "applying restraints." Hart said he was attempting to restrain Abernathie and he had his wrist restraints in his left hand until he dropped them during the altercation. Hart said Abernathie was never struck with the restraints during the incident. He could not remember if he immediately picked up the restraints or if he picked them up after the incident. Hart stated he struck Abernathie "three or four" times or "multiple times" as he stated in his report of incident with his right fist to gain compliance. Hart maintained he did not strike Abernathie with his left hand. Hart said he did not witness anyone else strike Abernathie because the effects of the pepper spray hindered his view.

He recalled Abernathie was upset due to an earlier cell search where his pictures were removed from the cell wall. Hart claimed Abernathie told him following the cell search he was doing "twenty-five" years and Hart did not know who he was messing with. Hart told him to leave the sergeant's office.

Hart also denied discussing the investigation with anyone since being placed on no offender contact status on 10/29/2021. Hart said he was not given an explanation as to why he was placed on no offender contact status.

I showed him the video footage and he identified himself as well as the other staff involved. He explained it was very difficult to place Abernathie in wrist restraints due to his suffering a broken hand during the incident. He explained even after placing wrist restraints on Abernathie it was difficult "to maintain control" of him. Hart stated Manche took over for him and he had no further contact with Abernathie.

19

Abernathie v Hart et al 000503



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
*Office of Professional Standards*

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

The photographs of Abernathie's injuries were also shown to Hart. He said he did not know what specifically caused Abernathie's injuries but speculated it could have been, "the shower head, shower hooks or somebody's finger nail." I asked how Abernathie received the wounds to his eye and the back of his head. Hart replied, "I cannot honestly tell you, conclusively. I'm not sure." When asked if he believed Abernathie had several injuries he said based on Abernathie's behavior he did not think so and he used the minimum amount of force necessary to gain control of Abernathie. Hart continued to deny striking Abernathie with any object, but he said he struck Abernathie in the back of the head "one maybe two times." Hart said he also struck Abernathie in the upper torso one or two times as well. He added he was not sure of the number of strikes because, "this is me guessing at this point."

I asked Hart if he would be willing to take a CVSA examination to verify his statements. He requested to see the policy; therefore, I printed D1-8.2 Truth Verification Examination- Staff Members and gave it to him. He asked if he would be considered "non-compliant" with the investigation if he refused. I told him it was possible and reiterated the examination is voluntary. After he read the policy, he voluntarily agreed to take the examination. He also read and signed he understood the truth verification examination release form. Unprompted, Hart stated, "I should have taken my medication before work today." He clarified he takes "anxiety medication and high blood pressure medication."

During the pretest interview, he maintained he utilized only the force necessary to control the offender. Hart also said he was positive the offender was not struck with his wrist restraints.

Hart's answers to the relevant questions showed "Deception Indicated." The CVSA examination is detailed in an attached CVSA supplemental report.

Following the examination, Hart claimed he failed because he was "annoyed, my blood pressure is high and I didn't take my medication, forty-five minutes after a twelve hour shift. I'm sure there could be numerous reasons."

Upon further questioning, Hart said, "At no time did I strike that offender with restraints." I asked if he was positive without any doubt in his mind. He answered, "No" and added, "You're starting to make me doubt myself of what I do know though." He further related, "It causes somebody to have self-doubt then. The way I'm feeling right now. Maybe it could have happened. I don't know with everything happening so fast and so much at once now I'm causing self-doubt on myself. I strive to push myself to remember that kind of stuff."

He recalled he was agitated about his hand and the amount of adrenaline he had going could have affected his recollection of the incident.

I re-asked the question if he struck Abernathie with restraints even inadvertently. Hart answered, "I can't say yes or no because I honestly don't recall." When asked if he intended to

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000504



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

strike Abernathie with restraints he replied, "No. That's a criminal charge. Definitely not! I love my job."

He also explained it is possible he did strike Abernathie more than three times in the back of the head because he really could not remember how many times he struck him. Hart denied he was attempting to punish Abernathie by striking him.

I asked if Abernathie's blood would be found on his wrist restraints. He did not know because he was not sure if he inadvertently struck Abernathie with the restraints or not. He conceded it is possible he struck Abernathie with the wrist restraints, as it could have been accidental during the "fray." He was sure he never intended to strike Abernathie with the restraints.

Hart stated his actions were appropriate for the amount of resistance the offender displayed. I confronted him with the witness statements that the amount of force employed on Abernathie appeared to be excessive. He maintained he believed his actions were appropriate.

This concluded the interview. A written statement was obtained but it was not consistent with the information he provided during the interview. When I brought this to his attention, Sgt. Hart elected to submit another written statement that was consistent with the statements he made after the CVSA examination. Both written statements were placed in the case file. **(TAB W)**

Immediately following the interview, due to Sgt. Hart's assigned wrist restraints being at his residence, my supervisor (INV III Richard Adair), approved taking Sgt. Hart in a state vehicle to his home in Leadington, Missouri in order to retrieve his wrist restraints. Sgt. Hart retrieved the restraints from his residence in less than a minute. However, while walking towards me in the state vehicle, he was twirling the restraints and dropped them into a puddle of water. He retrieved the restraints (serial number H-1001) and brought them to the vehicle and dropped them inside of a paper evidence bag. I then drove us back to ERDCC and dropped off Sgt. Hart at his personal vehicle. I notified Major McFerron that I obtained Hart's wrist restraints as potential evidence. **(TAB X)** The wrist restraints have been placed into evidence. During the interview I requested a DNA exemplar from Sgt. Hart, however, he declined my request. It is of note the restraints were not sent for laboratory testing at this time due to being submerged in water.

**SUMMARY OF INVESTIGATIVE FINDINGS**

**Allegation #1:** Sgt. Carl Hart utilized excessive force by repeatedly striking Offender Abernathie with a closed fist, fracturing his (Hart's) right hand and causing injuries to Abernathie's head and facial area.

There is sufficient evidence to show Sgt. Hart violated the following MODOC policies:

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000505



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
*Office of Professional Standards*

2021110034-C112198
Darrell Waggaaner INV II
04/25/2022

**D1-8.6 Offender Physical Abuse** which states in part, "When a person including a staff member or another offender, knowingly injures any offender by beating, striking, kicking or wounding."

**D2-11 Employee Standards** which states in part, "Employees of the state are expected to comply with the statutes of Missouri at all times."

**D2-11.10 Staff Member Conduct** which states in part, "…staff members are expected to adhere to the following professional principles of conduct: treat all persons respectfully, honestly and with dignity; perform duties responsibly; make ethical decisions and act in an ethical manner; and abide by the laws."

**IS-20 3.1 Use of Force Guidelines and Reports**, which states in part, "Only the minimum amount of force necessary to gain or maintain control, provide defense measures, and enforce established rules should be used."

The facts supporting these findings are as follow. On 10/28/2021, Offender Abernathie evaded staff after being pepper sprayed for refusing to return to his cell. Abernathie went to the shower to rinse off the pepper spray and was followed by Sgt. Hart and COs Spradling and Messersmith. Hart reported Abernathie allegedly attempted to "strike staff with elbow strikes" therefore he applied "multiple hard empty hand distraction techniques to the upper shoulder and back of the head (Abernathie's) with a closed fist." CO Messersmith and Spradling witnessed Abernathie facing the wall moving his arms they stated they did not observe Abernathie strike anyone. Spradling witnessed Hart strike Abernathie and Messersmith stated his view was obstructed but he could see Hart moving his arms toward Abernathie.

NP Ferguson examined Abernathie on 10/29/2021 and verbally noted the following possible injuries:

Possible jaw fracture to the lower mandible as well as the "TMJ" (hinge) joint, possible "right orbital fracture", and a possible "fractured rib." It is of note upon further testing it was determined Abernathie did not suffer any fractures.

Ferguson also observed significant bruising to Abernathie's jaw and facial area. The medical records noted injuries to Abernathie's "right eyebrow ("quarter size knot observed"), lower jaw and the back of his head." There was also, "dried blood noted to the back of right ear and on the back of patient's head." The medical records further indicate Abernathie was evaluated due to suffering "blunt trauma."

Sgt. Hart is right handed and suffered a fractured right ring finger at the knuckle or what is commonly known as a "boxer's fracture during this incident. His accident cause evaluation

22



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

report states he "struck his hand against an "unknown object." However, Hart's report of incident states he struck Abernathie "multiple" times in the back of his head with a closed fist.

During an interview with Abernathie he claimed he was struck repeatedly with an unknown object. Photographs of Abernathie's injuries were examined by Forensic Pathologist Russell Diediker. Dr. Diediker stated in his opinion the injuries sustained by Abernathie on his left cheek and the back of his head appeared to be "incised" wounds possibly caused by a sharp object such as metal wrist restraints. However, he could not make a definitive determination. CO Armbruster observed someone with a set of wrist restraints in their hand inside of the shower. In addition, Hart admitted he had his wrist restraints in his left hand during the altercation. Hart also admitted there was a possibility he inadvertently struck Abernathie with the wrist restraints during the altercation. Hart further stated he struck Abernathie repeatedly with a closed fist.

Based on the physical evidence and eyewitness accounts Sgt. Hart admitted he repeatedly struck Offender Abernathie in the head and facial area with a closed right fist. Hart's actions caused injuries to Abernathie and resulted in Hart suffering a broken right hand. Abernathie stated he was struck with a metal object repeatedly. A staff member observed an unknown person holding wrist restraints in their hand inside of the shower during the struggle with the offender. Sgt. Hart admitted he was holding wrist restraints in his hand during the struggle and it was possible he struck the offender with the wrist restraints. The injuries suffered by Abernathie and eyewitness accounts suggest Hart struck Offender Abernathie in the facial area and the back of the head with a set of wrist restraints.

**Allegation #2:** Sgt. Tyson Manche repeatedly struck Offender Abernathie with a closed fist while Abernathie appeared to be compliant.

There is **insufficient evidence to show Sgt. Manche violated any MODOC policies** by striking a compliant offender.

The facts supporting this finding are as follow. Sgt. Manche reported he struck Abernathie in the right side rib cage area with a closed fist twice to gain compliance in securing Abernathie. The video footage did not appear to show Abernathie struggling when Manche applied the blows, however, there were several staff involved in the incident therefore there was not a clear view of Abernathie. Sgt. Reckert observed Manche strike Abernathie and he stated the blows were justified and necessary to gain control of the offender. Reckert stated immediately after Manche struck Abernathie he was able to gain control of his arm. In addition, Manche stated he was trained to utilize "distraction techniques" if needed to secure an offender. Manche said he only administered the minimum amount of force necessary to secure Abernathie.

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000507



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
Office of Professional Standards

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

**Allegation #3:** CO Dennis Spradling utilized excessive force by repeatedly struck Offender Abernathie with a closed fist in the torso.

There is **sufficient evidence to show CO Dennis Spradling violated IS-20 3.1 Use of Force Guidelines and Reports**, which states in part, "Only the minimum amount of force necessary to gain and maintain control, provide defense measures, and enforce established rules should be used."

The facts supporting this allegation are as follows. On 10/28/2021, Offender Abernathie evaded staff after being pepper sprayed for refusing to return to his cell. Abernathie went to the shower to rinse off the pepper spray and was followed by Sgt. Hart and COs Spradling and Messersmith. Spradling reported he "utilized a distraction technique in the form of a closed fist to Offender Abernathie's right ribcage multiple times in an attempt to gain compliance." During an investigative interview with Spradling he stated, "I know I hit him too many times too." Spradling said, "Five or six times is a little bit too much."

**Allegation #4:** CO Edwin Messersmith failed to report offender abuse.

There is **insufficient evidence to show Messersmith violated any MODOC policies**. During an investigative interview Messersmith maintained he did not witness anyone strike Abernathie in the head or facial area. There is no video footage available as it took place inside of the shower.

**Allegation #5:** CO Gary Tifenauer failed to report a use of force.

There is **sufficient evidence to show CO Gary Tifenauer violated IS20-3.1 Use of force Guidelines and Reports** which states in part, "Each employee involved in or witnessing the use of force incident will submit a handwritten or typed Report of Incident form to the shift supervisor prior to leaving duty."

The facts supporting this finding are as follow. On 10/28/2021, CO Tifenauer was the control room officer in HU 7 when this use of force took place. During an investigative interview, Tifenauer admitted he witnessed the use of force with the exception of what took place in the shower. Tifenauer further stated he did not tell the shift supervisor he witnessed the incident and he did not submit a report of incident. Tifenauer claimed he did not know he was supposed to submit a report if he was not directly involved.

**Additional Supervisory Issues:**

**Supervisory Issue 1:** During the investigation, it was determined that Sgt. Carl Hart, Sgt. Tyson Manche and CO Dennis Spradling utilized the state computer and email system to send and receive non-work-related information.

*Improving Lives for Safer Communities* Abernathie v Hart et al 000508



MISSOURI DEPARTMENT OF CORRECTIONS
**Office of the Director**
*Office of Professional Standards*

2021110034-C112198
Darrell Wagganer INV II
04/25/2022

There is **sufficient evidence to show Sgt. Hart, Sgt. Manche and CO Spradling violated D1-7.1 Information Systems**, which states in part, "E-mail is provided to staff for business purposes only and should not be used for personal communications."

The facts supporting this finding are as follow. Hart's, Manche's and Spradling's state email account was examined from 10/01/2021 through 02/09/2022. The examination revealed Hart sent and received over 134 non-work-related communications. Manche sent and received at least 32 no-work-related communications and Spradling sent at least one non-work-related email with attached personal photographs. During investigative interviews, they admitted to utilizing the state email system for personal use.

*Improving Lives for Safer Communities*

Abernathie v Hart et al 000509